UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

SALVATORE GARRETTO,                :

                    Plaintiff,     :     15 Civ. 8734 (HBP)

     -against-                     :     OPINION AND
                                         ORDER
CAROLYN W. COLVIN, Acting          :
Commissioner of Social Security
                                   :

                    Defendant.     :

                                   :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his application for

supplemental security income ("SSI") and disability insurance

benefits ("DIB").  Both plaintiff and the Commissioner have moved

for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure (Docket Items ("D.I.") 16, 19).

Both parties have consented to my exercising plenary jurisdiction

pursuant to 28 U.S.C. § 636(c) (D.I. 9).  For the reasons set

forth below, plaintiff's motion for judgment on the pleadings is

granted, this matter is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g), and the Commissioner's motion for judgment on the pleadings is denied.

II.  Facts[1]

    A.  Procedural Background

        In his applications for SSI and DIB, plaintiff alleged that he became disabled on August 4, 2010 due to spinal stenosis,[2] multilevel degenerative disc disease,[3] canal stenosis

---

    [1]I recite only those facts relevant to my review.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (See Notice of Filing of Administrative Record, dated December 19, 2015 (Docket Item 13) ("Tr.")) more fully sets out plaintiff's medical history.

    [2]Stenosis refers to an obstruction or a constriction. Dorland's Illustrated Medical Dictionary ("Dorland's") at 1769 (32nd ed. 2012).  The central canal of the spinal cord is "a small canal extending throughout the length of the spinal cord, lined by ependymal cells."  Dorland's at 278.

    [3]Dorland's does not define degenerative disc disease.  New York University's Langone Medical Center defines degenerative disc disease as a "condition [that] causes the spongy layers of cartilage that cushion the bones of the spine to deteriorate, often as a natural part of aging.  Over time, changes in the size and resiliency of the discs can cause persistent, aching pain in the back or neck, and may make everyday movements difficult." "Degenerative Disc Disease in Adults," available at http://nyulangone.org/conditions/degenerative-disc-disease-in-adults (last visited March 6, 2017).

at L1-2 and L2-3[4] and concentric disc bulge with posterior annu-
lar[5] tear at L1-2 (Tr. 78, 194-97, 209-224).  He later amended
his claim to allege that he was also disabled to due "anxiety and
panic attacks" (Tr. 250).  The claims were initially denied by
the Social Security Administration ("SSA") on October 24, 2012
(Tr. 100).  Plaintiff requested a hearing, and Administrative Law
Judge ("ALJ") Katherine Edgell conducted a hearing on December
17, 2013 during which plaintiff, who was represented by an
attorney, testified on his own behalf (Tr. 50-77).  The ALJ also
conducted a second hearing on April 1, 2014 during which a
vocational expert testified (Tr. 24-49).  On May 9, 2014, the ALJ
issued a decision finding that plaintiff was not disabled (Tr.
11-20).  The ALJ's decision became the Commissioner's final
decision when the Appeals Council denied plaintiff's request for
review on September 4, 2015 (Tr. 1-3).

_____

[4]The lumbar vertebrae, denoted by symbols L1 through L5, are
the five vertebrae below the thoracic vertebrae and above the
sacrum.  Dorland's at 1662, 2051.  The thoracic vertebrae,
denoted by symbols T1 through T12, are usually twelve in number
and are situated between the cervical and the lumbar vertebrae,
giving attachment to the ribs and forming part of the posterior
wall of the thorax.  Dorland's at 2051.

[5]Annulus refers to a circular or ringlike structure.
Dorland's at 94, 111.  The "an[n]ulus fibrosus of intervertebral
disk" is "the circumferential ringlike portion of an
intervertebral disk, composed of fibrocartilage and fibrous
tissue."  Dorland's at 111.

3

B.  Social Background

Plaintiff was born in 1967 and was 43 years old at his alleged disability onset date (Tr. 19).  He graduated from high school and from a police academy (Tr. 55, 213).[6]  Plaintiff worked as a police officer and detective with the Middletown, New York Police Department from 1993 to August 2010, and his official retirement for "Accidental Disability" was approved in January 2012 (Tr. 31, 250, 271).  From May 2010 to August 2010, plaintiff was restricted to light-duty desk work (Tr. 59-61, 396).  Plaintiff also sought and received worker's compensation benefits during the disability period; the record does not reflect when the claim was approved, but plaintiff reported to SSA that his worker's compensation benefits terminated on July 26, 2012 (Tr. 194).

Plaintiff is single, has no children and lives alone in an apartment on the first floor of a two-family house that he owns (Tr. 53-54, 197, 303).  His mother and aunt live on the second floor (Tr. 53-54).

---

[6]The record does not identify the police academy from which plaintiff graduated.

C.   <u>Medical Background</u>

    1.   Medical Evidence Prior
       to Alleged Disability
       <u>Onset Date of August 4, 2010</u>

      a.   Emergency Room Visit at
         <u>Orange Regional Medical Center</u>

On May 11, 2010, plaintiff went to the emergency room at Orange Regional Medical Center in Goshen, New York with complaints of long lasting, moderate, achy, dull and throbbing lumbosacral pain[7] (Tr. 373).  The hospital notes state that plaintiff injured his back when he moved a device used to detect speeding motorists, and that ever since that event, he had had intermittent back pain (Tr. 373).  Plaintiff went to the emergency room that day because he had experienced a back spasm and increased pain (Tr. 373).  A nurse wrote that plaintiff's "function limitation [was] minimal," he had an antalgic gait,[8] and he was "unable to bend and unable to do activities of daily living" (Tr. 373).  Plaintiff had normal motor strength, but had lumbar tenderness and decreased range of motion in his lumbar spine (Tr. 367, 374).

---

[7]"Lumbosacral refers to "the lumbar vertebrae and sacrum, or to the lumbar and sacral regions." <u>Dorland's</u> at 1076.

[8]Antalgic means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." <u>Dorland's</u> at 97.

A lumbar x-ray showed "mild disc space narrowing" at L1-L2 and L2-L3 and noted "partial lumbarization[9] of the first sacral segment, a common variant" and "[n]o acute pathology" (Tr. 336).  Plaintiff was diagnosed with low back pain, treated with a non-steroidal anti-inflammatory drug and a muscle relaxant and discharged with instructions to follow up with his primary doctor and orthopedic doctor for continued care and a Magnetic Resonance Imaging scan ("MRI") (Tr. 373-75, 377).

b.   MRI by Dr. Carl Silverio, Radiologist

Dr. Carl Silverio, a radiologist, conducted an MRI of plaintiff's lumbar spine on May 15, 2010 (Tr. 313).  The MRI showed mild multilevel degenerative disc disease at the L1-L2 and L4-L5 levels, an L1-L2 concentric disc bulge with a posterior annular tear that contributed to mild central canal stenosis, and disc bulging which indented the ventral thecal sac at the L2-L3 level and that contributed to mild central canal stenosis (Tr. 313).  The radiologist did not identify any focal disc herniations,[10] and found that the soft tissues were "unremark

---

[9]Lumbarization refers to "a condition in which the first segment of the sacrum is not fused with the second, so that there is one additional articulated vertebra and the sacrum consists of only four segments." Dorland's at 1076.

[10]A herniated disc is the protrusion of the nucleus pulposus
(continued...)

able" (Tr. 313).  The radiologist indicated that his "impression" was that plaintiff had "[m]ild degenerative disc disease and disc bulges . . . with mild central canal stenosis at the L1-L2 and L2-L3 levels" (Tr. 313).

### c. Dr. Marc Rosenblatt, Rehabilitation and Pain Management Doctor

Dr. Marc J. Rosenblatt, a rehabilitation and pain management doctor, examined plaintiff on June 15, 2010 (Tr. 303). Plaintiff stated that, after he was injured at work, he developed low back pain and pain radiating down his left lower leg (Tr. 303).  Dr. Rosenblatt noted that plaintiff had an MRI that revealed mild multilevel degenerative disc disease, disc bulges with mild canal stenosis at L1-2 and L2-3 and a concentric disc bulge with posterior annual tear at L1-2 (Tr. 303).  Dr. Rosenblatt examined plaintiff and concluded that plaintiff's sensation was "intact throughout," that his "[m]otor evaluation [was] 5/5," and that the "[e]valuation of the thoracolumbar spine reveals relative suppleness with full range of motion" and "sporadic trigger points"[11] (Tr. 303-04).  The doctor's impres

---

[10](...continued)
or anulus fibrosus of an intervertebral disk, which may impinge on spinal nerve roots.  Dorland's at 852.

[11]A trigger point is "a point on a muscle, ligament, tendon
(continued...)

sion was that plaintiff had "disc disease with annular tear at L1-L2" and Dr. Rosenblatt's report indicates that he wanted to perform a lower extremity electromyographic study to rule out radiculopathy[12] (Tr. 303-04).

The record does not include any other treatment notes or reports from Dr. Rosenblatt.  However, plaintiff reported in a form to SSA that, on an unspecified date, Dr. Rosenblatt administered a "[c]orticosteroid [i]njection to injured disc(s) in [the] lumbar area" (Tr. 215).

### d. Physical Therapy, June through July 2010

Based on plaintiff's primary physician Dr. Raymond Basri's referral, plaintiff attended four physical therapy sessions at Scotchtown Physical Therapy in June and July of 2010 (Tr. 260-62).  Plaintiff stated in the intake form that he had lower back pain that caused him to have difficulty sitting, bending and lifting and that the pain was interfering with his work, sleep and daily routine (Tr. 258).  Plaintiff's pain caused

---

[11](...continued)
or area of fascia that when touched causes referred pain."
Dorland's at 1480.

[12]Radiculitis refers to inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and intervertebral canal.  Dorland's at 1571.

8

him to experience aching, tingling, numbness and stiffness (Tr. 258-59). The physical therapist's evaluation showed that plaintiff's lower spine range of motion and strength were normal and straight leg raising tests[13] were negative, but that plaintiff had tightness and discomfort on palpation[14] of the L3-L4 vertebrae (Tr. 260-62). The physical therapist opined that plaintiff's symptoms were consistent with a lumbar strain (Tr. 260-62). Plaintiff stopped attending physical therapy because he felt that it was making his pain worse (Tr. 298).

### e.  Dr. Harvey Seigel, Orthopedist

On July 24, 2010, Dr. Harvey Seigel, an orthopedist from "Post-Trauma Medical Services, P.C.," conducted an "Orthopedic Evaluation" of plaintiff (Tr. 296-302). Although the record does not clearly state how Dr. Seigel came to examine plaintiff, it appears that he provided an independent medical examination for plaintiff's worker's compensation claim. Plaintiff reported

---

[13]A straight leg-raising test is a test in which the patient lies supine and "the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved." Dorland's at 1900.

[14]Palpation is the act of feeling with the hand or the application of the fingers with light pressure to the surface of the body for the purpose of making a physical diagnosis of the parts beneath. Dorland's at 1365.

to Dr. Seigel that he had left leg weakness and constant, and sometimes severe, low back pain, that intermittently radiated down his left leg and occasionally radiated "up his spine and anteriorly into his left pectoralis area" (Tr. 296, 298-99). Plaintiff reported that sitting in one position, bending and lifting increased his pain (Tr. 299).

Dr. Seigel noted that "[a]ll throughout the lengthy history taking interval, [plaintiff] move[d] about normally" and "move[d] his head, neck, trunk, as well as the upper and lower extremities without any evidence of physical discomfort" (Tr. 299-300). Dr. Seigel found that plaintiff had a full range of motion in his thoracic and lumbosacral spine, a negative straight leg raising test, no areas of tenderness or muscle spasm in the midline or in the paraspinal musculature of the entire thoracic or lumbosacral spine, that plaintiff's legs had "no evidence of muscle weakness," that he could walk on his heels and toes and that he had a normal gait (Tr. 300-01). Dr. Seigel noted that plaintiff could bend forward and bring his fingertips to within six inches of the floor but that plaintiff "straighten[ed] up slowly" and sat up "slowly and with some difficulty due to low back pain" (Tr. 300-01). Dr. Seigel diagnosed plaintiff with a "lumbosacral sprain/strain, with possible radiculopathy" and recommended physical therapy (Tr. 302). Dr. Seigel noted that

10

plaintiff was then doing only light, desk work and opined that such work was "reasonable at [the] time" (Tr. 302).

### f. Dr. Neal Dunkelman, Physical Medicine and Rehabilitation Doctor

On August 2, 2010, Dr. Neal Dunkelman, a doctor of physical medicine and rehabilitation, examined plaintiff and conducted motor nerve and sensory nerve conduction studies and an electromyography ("EMG")[15] to assess plaintiff's back pain.  Dr. Dunkelman found that plaintiff had tenderness and spasm upon palpation of the lumbar muscles, lumbar flexion of 60 degrees (out of 90),[16] a negative straight leg raising test and "no sensory deficits" (Tr. 265-66).  Dr. Dunkelman's studies all showed normal results and the doctor concluded that there was "no electrical evidence of radiculopathy or neuropathy" (Tr. 265-66).

---

[15]An EMG is "an electrodiagnostic technique for recording the extracellular activity . . . of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation."  Dorland's at 602.

[16]Many of the physicians who examined plaintiff assessed his range of motion in the lumbar and/or cervical spine.  Full flexion of the lumbar spine is 90 degrees.  Full lateral flexion of the lumbar spine is 25 degrees bilaterally.  Full flexion of the cervical spine is 50 degrees and full extension of the cervical spine is 60 degrees (See Tr. 433-34, which includes a copy of the Range of Motion Chart prepared by the New York State Department of Temporary and Disability Assistance (Rev. March 2002)).

2.   Medical Evidence
     After Alleged Disability
     <u>Onset Date of August 4, 2010</u>


a. Dr. Raymond Basri,
   <u>Internal Medicine Doctor</u>


Although Dr. Basri indicated that he had treated plaintiff on a regular basis once a week starting in June of 2010 (Tr. 273, 425), the record contains only two notes from Dr. Basri that pre-date February 2011.  There is a note from Dr. Basri dated August 6, 2010 that is entitled "Activity Restriction" (Tr. 253).  The note is not addressed to anyone and states that "[t]his letter is to verify that Sal Garretto has currently been under my care from 8-4-10 to 8-6-10" and that he cannot return to work "till [<u>sic</u>] further notice due to back injury" (Tr. 253).

The record also includes a letter that Dr. Basri wrote on December 10, 2010 to the Medical Board of the New York State and Local Retirement System (Tr. 273).  Dr. Basri wrote that he had diagnosed plaintiff with degenerative joint disease of the lumboscracral spine and an annual tear of the lumbar discs at L1-2 and L2-3 (Tr. 273).  Dr. Basri opined that plaintiff was "totally disabled" on the basis of his back condition (Tr. 273).  Dr. Basri noted that he had prescribed narcotic pain medication for plaintiff, and had referred plaintiff for MRIs, physical

12

therapy, pain management and for a consultation with a neurosurgeon (Tr. 273).[17]

Dr. Basri's treatment notes from February 2011 through December 2013 are extremely brief and provide no details and many of the notations are illegible (Tr. 453-58).  The summary provided here is, therefore, based on only the legible portions of these notes.  On April 5, 2011, Dr. Basri reported that plaintiff's lower back pain was "moderately bad;" on May 3, 2011 Dr. Basri noted that plaintiff's lower back pain was "controlled" and radiated to both of his legs and that his vital signs were "stable" (Tr. 457).  On May 31, 2011, plaintiff had severe pain, on July 5, 2011, Dr. Basri noted that plaintiff's pain was better and on August 2, 2011 Dr. Basri noted that plaintiff's pain was well-controlled (Tr. 457).  Later in August 2011, Dr. Basri's notes indicate that plaintiff was experiencing moderate pain (Tr. 457).

On March 28, 2012, plaintiff reported that he had had continuous lower back pain and on May 5, 2012, Dr. Basri noted that plaintiff still had pain.  In June 2012, Dr. Basri noted that he asked plaintiff to consider surgery (Tr. 456).  In June

---

[17]Dr. Basri addressed a similarly worded letter to plaintiff's attorney on March 28, 2012 (Tr. 274).

and July of 2012, plaintiff reported that he had moderate lower back pain and was using a TENS device[18] (Tr. 456).

On September 18, 2012, Dr. Basri completed a form medical source statement for the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations (Tr. 425).  Dr. Basri diagnosed plaintiff with "Lumbar Disc Herniation" that caused lower back pain that radiated to both legs and indicated that the duration of plaintiff's condition was "unknown" (Tr. 425-26).  Plaintiff's treatment included narcotic analgesics and physical therapy, but Dr. Basri noted that plaintiff had "refused surgery + epidurals" (Tr. 426, 432).  Dr. Basri reported that hydrocodone relieved plaintiff's pain for five to six hours and that plaintiff had a "good response" to using a corset and to treatment with a TENS device (Tr. 429).  Dr. Basri did not find that plaintiff had "displayed any behavior suggestive of a significant psychiatric disorder," did not report any

---

[18]TENS refers to transcutaneous electrical nerve stimulation.  Dorland's at 1951.  "Transcutaneous electrical nerve stimulation (TENS) is a common form of noninvasive pain treatment involving the use of electrical current, transmitted via electrodes placed on the skin."  McGann v. Colvin, 14 Civ. 1585 (KPF), 2015 WL 5098107 at *1 n.2 (S.D.N.Y. Aug. 31, 2015) (Failla, D.J.), citing Josinari M. DeSantana et al., Effectiveness of Transcutaneous Electrical Nerve Stimulation for Treatment of Hyperalgesia and Pain, Current Medicine Group (2008), available online at http://www.ncbi.nlm.nih.gov/pmc/articles-/PMC2746624.

other conditions that were "significant to recovery" and did not mention plaintiff's prescriptions for anti-anxiety medication or sleep aids in the portion of the form that asked him to list the medications he had prescribed for plaintiff (Tr. 426, 432).  Dr. Basri reported that his examination disclosed that plaintiff's flexion of the lumbar spine was 60 degrees (out of 90) and lateral flexion of the lumbar spine was 10 degrees (out of 25) (Tr. 434).  Dr. Basri opined that plaintiff could lift and carry ten pounds occasionally, could stand and/or walk for less than two hours per day, could sit for less than six hours per day and was limited in pushing and pulling (Tr. 430-31).

In November 2012, Dr. Basri noted that plaintiff had moderate lower back pain (Tr. 455).  In January 2013, plaintiff reported that he experienced severe lower back pain if he stayed in one position for too long (Tr. 455).  In January and in February 2013, Dr. Basri noted that plaintiff had moderate lower back pain and in March through June of 2013, plaintiff reported to Dr. Basri that he was "doing ok," but experiencing moderate pain (Tr. 454-55).

In October 2013, plaintiff reported increased pain for several days, and Dr. Basri gave plaintiff prescriptions for hydrocodone and morphine sulfate (Tr. 453).  On December 2, 2013, plaintiff reported that he had had pain on his right side for two

days and went to the emergency room where he was seen by a surgeon (Tr. 453).[19]

Dr. Basri's treatment notes also indicate that plaintiff was experiencing anxiety and panic attacks relating to his back pain and that Dr. Basri prescribed anti-anxiety medication (including Xanax) and sleep aids (including Ambien) to treat these conditions for more than a twelve-month period (Tr. 456-58).  Dr. Basri's notes also indicate that he prescribed Cymbalta for plaintiff's depression (Tr. 457).  There are legible references in Dr. Basri's notes to prescriptions for Xanax, Ambien and/or Cymbalta on July 5, 2011, August 2, 2011, August 30, 2011, October 4, 2011, October 31, 2011 August 14, 2012, September 18, 2012, October 16, 2012, November 20, 2012, January 3, 2013, July 23, 2013, August 20, 2013, September 24, 2013 and November 13, 2013 (Tr. 453-58).  On August 14, 2012, Dr. Basri noted that plaintiff reported that he had two anxiety attacks related to his back pain (Tr. 456).  Dr. Basri noted similar incidents in July and November 2013 (Tr. 453-54).

---

[19]The hospital records from this visit are not in the record.

16

b. <u>Dr. Steven Jacobs, Neurosurgeon</u>

On August 17, 2010, Dr. Steven Jacobs, a neurosurgeon,
examined plaintiff and provided an "Initial Comprehensive Consul-
tation" at Dr. Basri's request (Tr. 394).   Plaintiff told Dr.
Jacobs that he had severe lower back pain that he rated as an 8
or 9 out of 10, intermittent numbness and tingling in his left
leg and intermittent weakness in both legs (Tr. 395).   Plaintiff
reported that he was taking Vicodin and Thyroidal for pain and
Skelaxin for muscle spasm (Tr. 396).   Plaintiff also reported
that the pain did not respond to physical therapy or Vicodin and
that he had not had epidural or trigger point injections (Tr.
395).   Plaintiff stated that his pain was aggravated by lifting,
bending, pushing and pulling (Tr. 395).   Plaintiff reported that
he had difficulty rising from a seated position, maintaining one
position for more than five minutes, dressing and undressing,
sleeping through the night and "performing household tasks, such
as cooking, cleaning, doing the laundry, making a bed or shop-
ping" (Tr. 396).

Dr. Jacobs noted that plaintiff could not remain in one
position while reporting his history and that plaintiff had
increased pain when rising from a seated position, going from a
supine position and then back to a seated position, rolling over,

17

getting on and off the examination table, changing positions and that plaintiff had trigger points, muscle spasms and lordosis[20] (Tr. 396-97).  A straight leg raising test with plaintiff in the supine position was positive at 45 degrees on the left side but was negative when plaintiff was in a seated position (Tr. 396-97).  Dr. Jacobs found that plaintiff had a painful and re-stricted range of motion in his lumbar spine and noted that plaintiff's

> range of motion of the lumbar spine is restricted and painful.  Forward flexion is 0 to 45° and painful (nor-mal 0 to 90°).  Extension is painful 0 to 15° (normal 0 to 30°).  Right and left rotation is painful 0 to 30° (normal 0 to 45°).  Right and left lateral bending is painful at 0 to 15° (normal 0 to 25°).  There is obvi-ous paravertebral muscle spasm and straightening of the normal lumbar lordosis.

(Tr. 397).  Dr. Jacobs found that plaintiff's motor strength in the L4, L5 and S1 nerve roots was five out of five bilaterally, but that there was pain to palpation to plaintiff's lower back, to the third fourth and fifth lumbar vertebral bodies, the first sacrum and the lumbar paraspinal muscles from L1 to S1 bilater-ally and from T9 to T12 bilaterally (Tr. 397).  Plaintiff's pain increased when he walked on his toes, but Dr. Jacobs found that

---

[20]Lordosis refers to "abnormally increased concavity in the curvature of the lumbar vertebral column as viewed from the side."  Dorland's at 1074.  Lumbar lordosis refers to "the dorsally concave curvature of the lumbar vertebral column when seen from the side."  Dorland's at 1074.

plaintiff's ability to walk on his heels and toes was "grossly intact" (Tr. 397).

Dr. Jacobs described plaintiff as "a patient in pain," found that plaintiff's prognosis was guarded and opined that plaintiff had a "marked 75% disability and is totally disabled from his job description as a police detective" (Tr. 397).  Dr. Jacobs diagnosed plaintiff with a traumatic lumbar disc displacement and post-traumatic lumbar disc degeneration; he gave plaintiff a prescription for a back brace and ordered a discogram[21] (Tr. 398).

### c. Physical Therapy, August 2010 through October 2010

Plaintiff attended approximately 20 physical therapy sessions between August and October 2010 (Tr. 347-52).  At his initial visit on August 13, 2010, plaintiff reported that he had low back pain that radiated to his left leg, left leg paresthesia,[22] fatigue in his lower back and that he was unable to sit for long time (Tr. 347-49).  Plaintiff stated that he had a "history of anxiety attacks" and that he had been prescribed

---

[21]A discogram is a radiograph of an intervetebral disc. Dorland's at 527, 547.

[22]Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  Dorland's at 1383.

Ambien, Vicodin, Skelarin and toradol PRM (Tr. 347).  Plaintiff's
straight leg raising test was positive at 45 degrees (Tr. 347-
49).  The grip in plaintiff's right hand was 140 pounds and his
left hand grip was 100 pounds (Tr. 348).  The therapist opined
that plaintiff had a lumbar spine derangement (Tr. 347-49).

On August 20 and 24, 2010, plaintiff told his physical
therapist that he was experiencing increased back pain (Tr. 348).
In a September 9, 2010 progress note, the therapist noted that
plaintiff still had numbness in his lower leg and that his
average pain was 5 out of 10, that he had weakness in his left
leg of "4-4+/5," and that his spinal range of motion was 50% with
pain (Tr. 352).

> d.  Dr. Donald Davis,
>     Consulting Neurosurgeon

Dr. Donald Davis, a neurosurgeon, conducted independent
medical examinations of plaintiff on October 8, 2010 and August
19, 2011 in connection with plaintiff's worker's compensation
claim (Tr. 286-90, 399-408).

At the October 2010 visit, plaintiff complained of
lumbar pain, primarily in his lumbosacral spine, with some
radiation into both legs and of significant pain in his lower
back (Tr. 287).  Plaintiff also told Dr. Davis that he had

occasional weakness in both legs that caused him to have some problems in standing and walking (Tr. 287).

Dr. Davis noted that the radiological findings showed that plaintiff had an annular tear at L1-2, L2-3, bulging discs and multilevel degenerative disc disease, but that an EMG was negative and, consistent with Dr. Davis' examination, did not suggest any neural element involvement (Tr. 287-88).  On examination, Dr. Davis found that plaintiff had "limitation of flexion and extension and pain on direct palpation of the lumbar spine" (Tr. 287-88).  Dr. Davis opined that plaintiff had a sprain to his lumbar spine and noted that Drs. Siegel and Jacobs had reached the same opinion (Tr. 286).  He noted that plaintiff's MRI report suggested that plaintiff had degenerative disc disease with stenosis at multiple levels but did not show evidence of a herniated disc (Tr. 286).  Dr. Davis concluded that plaintiff's "pathology [was] primarily axial"[23] and showed that there was aggravation of pre-existing multilevel degenerative disc disease (Tr. 288).

Dr. Davis also opined that plaintiff should not lift anything heavier than five to ten pounds, avoid prolonged bend-

---

[23]Axial back pain is "low back pain limited to the middle (spinal axis) of the lumbar region."  Dorland's at 1363.

ing, reaching and stooping and should alternate frequently between sitting and standing (Tr. 287).

Dr. Davis supplemented the opinions from his October 2010 examination with a letter dated November 10, 2010 (Tr. 402-08). Dr. Davis clarified that plaintiff's prognosis is "quite guarded and . . . that it is unlikely that [plaintiff would be able to] return to the workplace particularly in his previous job description" (Tr. 403). Dr. Davis did not recommend surgery for plaintiff because he believed that plaintiff had reached his maximum improvement and that surgery would provide no incremental benefit (Tr. 403).

The results of Dr. Davis' examination in August 2011 were similar to those of his previous examination (Tr. 282-83). Dr. Davis found that plaintiff had severe pain in his lower lumbar spine and lumbar spasm (Pl. 282-83). Dr. Davis diagnosed plaintiff with "[s]prain/strain to the lumbar spine with a mechanical back injury and consistent low back pain secondary to soft tissue injury and myofascial pain" and "degenerative disc disease at multiple levels with moderate spinal stenosis" (Tr. 281). Dr. Davis noted that plaintiff had severe pain on any type of flexion or extension of the spine (Tr. 282).

Dr. Davis again opined that plaintiff had reached his maximum improvement, that he should avoid lifting anything

heavier than five to ten pounds, prolonged bending, reaching or stooping and should change positions "as necessary" (Tr. 282). The doctor noted that plaintiff took pain medication and did not recommend that plaintiff receive further physical therapy or other treatment (Tr. 282).

e. Dr. Jose Corvalan
Consultative Orthopedist

In October 2012, Dr. Jose Corvalan, an orthopedist, examined plaintiff at the request of the New York State Bureau of Disability Determinations (Tr. 438).  Plaintiff told Dr. Corvalan that he had pain in his lower back that radiated to his legs with numbness and tingling, as well as neck pain triggered by moving his neck (Tr. 437-38).  Dr. Corvalan noted that plaintiff's medications were zolpidem, alprazolam, hydrocodone with acetaminophen, omeprazole and simvastatin (Tr. 437-38).[24]  The doctor noted that plaintiff showered and dressed daily, cooked twice a day and cleaned, did laundry, shopped once a week, watched television, listened to the radio, read, went out to socialize and that his hobby was photography (Tr. 437-38).

Dr. Corvalan examined plaintiff and found that he had a normal gait and could walk on his heels and toes, squat fully and

_____

[24] Dorland's at 878, 1319, 1718.

rise from a chair without difficulty (Tr. 438-39).  However, plaintiff had limited range of motion in his cervical and lumbosacral spine, tenderness on lumbar palpation and a positive straight leg raising test at 30 degrees in the supine and sitting positions bilaterally (Tr. 438-39).  Plaintiff declined to attempt any backward extension (Tr. 439).  Plaintiff's range of motion in the cervical spine was 40 degrees in flexion (out of 50) and 30 degrees in extension (out of 60) and 30 degrees in rotation bilaterally (out of 80), with no cervical or paracervical spasm or pain (Tr. 438).  Plaintiff's range of motion in the thoracic and lumbar spine was 40 degrees in flexion (out of 90) and 20 degrees in lateral flexion (out of 25) and plaintiff had tenderness on palpation in the lumbar spine area (Tr. 438-39).

Dr. Corvalan diagnosed plaintiff with low back pain, neck pain and high cholesterol and opined that plaintiff had moderate limitations in his ability to move his neck, sit and stand for long periods of time, walk long distances, bend, squat, climb stairs and lift heavy objects (Tr. 439).

D.   <u>Proceedings Before the ALJ</u>

    1.   <u>Plaintiff's Testimony</u>

        Plaintiff testified at the December 17, 2013 hearing that he could not work due to back pain, insomnia, anxiety and panic attacks (Tr. 61).

        Plaintiff testified he had "paralyzing" anxiety attacks, which caused tightness in his chest, breathing trouble, tunnel vision, numbness in his hand and a feeling that he was having a heart attack and on the verge of losing consciousness (Tr. 61, 69, 74-75). Plaintiff's anxiety attacks were sporadic -- he could go days without having an attack or he could have attacks several times in a week or he could have daily attacks for a week (Tr. 61). The anxiety attacks lasted twenty minutes to an hour (Tr. 75). Plaintiff's anxiety attacks sometimes woke him up out of a deep sleep (Tr. 61). Plaintiff testified that he was treated by his primary care physician Dr. Basri for his anxiety attacks and had never seen a mental health professional for his anxiety (Tr. 61). Plaintiff stated that Dr. Basri prescribed plaintiff Xanax, which was "somewhat" helpful to address his symptoms and helped him sleep (Tr. 61, 69-70).

        Plaintiff also testified that he had "deep throbbing, aching" pain in his back and that he had the sensation that his

lower back was asleep and tingling (Tr. 75).  He testified that initially his leg pain was limited to his left leg, but that he now had pain in both legs, especially when he was sitting or standing for a "long period of time" (Tr. 75).  Plaintiff testified that he slept just two to three hours a night due to pain and anxiety (Tr. 61, 63).  Plaintiff stated that his back pain had worsened on May 11, 2010, when he rose from a sitting position and felt back pain with total leg weakness and tingling (Tr. 60, 372).  Plaintiff was treated with physical therapy, which he said did not help, and a TENS device (Tr. 62-63, 67).  Plaintiff testified that he also took morphine and hydrocodone to treat his back pain and testified that they helped alleviate the sharpness of the pain but caused him to sweat, have dry mouth and bowel obstructions and anxiety about potential drug addiction (Tr. 63).  Plaintiff described a "good day" as one in which he got more than two to three hours of sleep, was not taking "as much pain medication" and was not experiencing stomach problems (Tr. 76).  Plaintiff decided against having back surgery because his doctors told him that there was no guarantee that it would completely alleviate the pain and there was a risk that surgery might actually exacerbate his pain (Tr. 63, 72-73).

        Plaintiff testified that he had to change positions when sitting but that he could not quantify how long he could sit

before needing to change positions (Tr. 67-68).  Plaintiff testified that on one occasion he had driven his car for 45-60 minutes without a break to go to the doctor (Tr. 66-68).  Plaintiff also testified that due to his back pain, he was limited in his kneeling, squatting and reaching and sometimes had difficulty standing up straight (Tr. 68-69, 76, 234-36).  Plaintiff could stand and walk for about 20-40 minutes, depending on the day (Tr. 68).  He could keep his apartment "[a]s tidy as a bachelor can" and could tidy up outside his house (Tr. 63-65, 73-74).  It would take plaintiff one to two days to mow his lawn with a ride-on lawn mower because he would need to take breaks every 15-20 minutes to lie down (Tr. 74).  Plaintiff stated that he could prepare meals like frozen dinners, sandwiches and soup, and could do cleaning and laundry, but that he hired out "handyman jobs" (Tr. 65, 75, 231-32).  Plaintiff had trouble dressing himself and had to lie down to put on pants (Tr. 65, 75, 231-32).  He could shop for 20 minutes weekly (Tr. 233).  Plaintiff had trouble opening jars due to weakness and pain in his right hand, which had been broken twice in the past and was never "set right" (Tr. 68).  Although his hand was weak, plaintiff could write checks and zip and button clothing (Tr. 68-69).

Plaintiff testified that he spends his time reading about current events, watching television and walking around in

his backyard; his hobbies were photography, reading and surfing the internet (Tr. 63-64, 233).

### 2. Vocational Expert Testimony

Vocational expert Mary Anderson testified at the hearing and answered questions about whether hypothetical individuals with plaintiff's vocational profile and varying restrictions could perform jobs in the national economy.

Anderson testified that a person with plaintiff's vocational profile who can only lift or carry five to ten pounds, who can only bend, reach and stoop occasionally and who needs to change position at-will from sitting to standing, but could not engage in "prolonged flexion or extension of the spine" could not do plaintiff's past work or any other kind of work (Tr. 33-34).

Anderson testified that a person who can only lift or carry ten to twenty pounds occasionally, who can sit, stand and walk for up to six hours and can intermittently flex or extend the neck in any direction over the course of six hours, stoop, squat or climb stairs as needed for up to six hours in an eight

hour workday, could do the light[25] job of a travel clerk, which has 966,150 positions nationally (Tr. 36-37, 47-48).

Anderson further testified that a person who is limited to sedentary[26] desk work, who can only lift or carry five to ten pounds, was permitted to change between sitting and standing every 30 to 60 minutes and could occasionally reach, stoop and bend could do the work of a charge account clerk, which has 196,660 positions nationally or an address clerk, which has 96,560 positions nationally (Tr. 38-39, 46-47).

---

[25]The regulations define "light work" as that work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §§ 404.1567(b), 416.967(b).

[26]The regulations define "sedentary work" as that work which

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

Anderson also testified that if the latter two hypotheticals were changed such that the individual had panic attacks two to three times per week accompanied by pain and tightness in his chest and tingling in his hand that takes him off-task for up to one hour out of a workday, the individual could not do any work (Tr. 43-44).  The expert testified that anyone who is off-task for more than 48 minutes per day in addition to regular breaks was "really not employable" (Tr. 45).

III.  Analysis

    A.  Applicable Legal
        Principles

      1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."  Lesterhuis v.

30

Colvin, 805 F.3d 83, 87 (2d Cir. 2015), quoting Burgess v.
Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

     The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999).  "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322,
328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion."  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

     "'Substantial evidence' is 'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'"  Talavera v. Astrue,
supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S.
389, 401 (1971).  Consequently, "[e]ven where the administrative
record may also adequately support contrary findings on particu-
lar issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),

31

quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation
omitted).

    2.  Determination
      of Disability

A claimant is entitled to SSI and DIB if the claimant
can establish an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment . . . which has lasted or can be expected to
last for a continuous period of not less than twelve months."[27]
42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v.
Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the
inability to work must last twelve months).  In addition, to
obtain DIB, the claimant must have become disabled between the
alleged onset date and the date on which he was last insured.

---

[27]The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive DIB under Title II of the Act.
Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases
addressing the former are equally applicable to cases involving
the latter.

See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315;
McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (sum-
mary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir.
2008).

     The impairment must be demonstrated by "medically
acceptable clinical and laboratory diagnostic techniques," 42
U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) and it must be "of such
severity" that the claimant cannot perform his previous work and
"cannot, considering his age, education and work experience,
engage in any other kind of substantial gainful work which exists
in the national economy."  42 U.S.C. §§ 423(d)(2)(A), §
1382c(a)(3)(B).  Whether such work is actually available in the
area where the claimant resides is immaterial.  42 U.S.C. §§
423(d)(2)(A), 1382c(a)(3)(B).

     In making the disability determination, the Commis-
sioner must consider:  "(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age and
work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.
1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.
1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  To be found disabled based on a listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant listing.  20 C.F.R. § 404.1525(c)(3); Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007).  If the claimant meets a listing, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can

34

still perform his past relevant work given his RFC.  20 C.F.R.
§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas,
supra, 540 U.S. at 24-25.  If he cannot, then the fifth step
requires assessment of whether, given claimant's RFC, he can make
an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v).  If he cannot, he will be found disabled.  20
C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

　　　　RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite his limitations."
20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC,
the ALJ "identif[ies] the individual's functional limitations or
restrictions and assess[es] his or her work-related abilities on
a function-by-function basis, including the functions in para-
graphs (b),(c)and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."
Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per
curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at
*1 (July 2, 1996).  The results of this assessment determine the
claimant's ability to perform the exertional demands[28] of sus-
tained work which may be categorized as sedentary, light, medium,
heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Schaal

---

[28]Exertional limitations are those which "affect [plain-
tiff's] ability to meet the strength demands of jobs (sitting,
standing, walking, lifting, carrying, pushing, and pulling)."  20
C.F.R. §§  404.1569a(b), 416.969a(b).

v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may

then be found to be limited further by nonexertional factors that

restrict claimant's ability to work.[29]  See Michaels v. Colvin,

621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v.

Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

     The claimant bears the initial burden of proving

disability with respect to the first four steps.  Once the

claimant has satisfied this burden, the burden shifts to the

Commissioner to prove the final step -- that the claimant's RFC

allows the claimant to perform some work other than his past

work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v.

Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,

383 (2d Cir. 2004), amended in part on other grounds on reh'g,

416 F.3d 101 (2d Cir. 2005).

     In some cases, the Commissioner can rely exclusively on

the medical-vocational guidelines (the "Grids") contained in

C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-

tion at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98

---

     [29]Nonexertional limitations are those which "affect only
[plaintiff's] ability to meet the demands of jobs other than the
strength demands," including difficulty functioning because of
nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching.  20 C.F.R. §§ 404.1569a(c),
416.969a(c).

(N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Bapp v. Bowen, supra, 802 F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also

37

Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").  An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert base[s] his opinion."  Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); accord Snyder v. Colvin, 15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469, 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

3.  Duty to Develop
    the Record


"It is the rule in [the Second] [C]ircuit that 'the

ALJ, unlike a judge in a trial, must [him]self affirmatively

develop the record' in light of 'the essentially non-adversarial

nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34,

37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human

Servs., 685 F.2d 751, 755 (2d Cir. 1982) (alterations added); see

also 20 C.F.R. § 404.1512(d).

> This duty exists even when the claimant is represented
> by counsel or . . . by a paralegal . . . . The [Com-
> missioner's] regulations describe this duty by stating
> that, "[b]efore we make a determination that you are
> not disabled, we will develop your complete medical
> history . . . [and] will make every reasonable effort
> to help you get medical reports from your own medical
> sources when you give us permission to request the
> reports." 20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); accord Petrie v.

Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order)

("[W]here there are deficiencies in the record, an ALJ is under

an affirmative obligation to develop a claimant's medical history

even when the claimant is represented by counsel." (citation

omitted, alteration in original)); Halloran v. Barnhart, 362 F.3d

28, 31 (2d Cir. 2004) (per curiam) ("We have stated many times

that the ALJ generally has an affirmative obligation to develop

the administrative record . . . ." (internal quotation marks and

citation omitted)); <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999) (same); <u>Randolph v. Colvin</u>, 12 Civ. 8539 (LTS)(JLC), 2014 WL 2938184 at *8 (S.D.N.Y. June 30, 2014) (Cott, M.J.) (Report & Recommenda- tion) (same); <u>Van Dien v. Barnhart</u>, 04 Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same).

The ALJ is required "affirmatively to seek out addi- tional evidence only where there are 'obvious gaps' in the administrative record." <u>Eusepi v. Colvin</u>, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order), <u>quoting</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 & n.5 (2d Cir. 1999); <u>accord</u> <u>Swiantek v. Commr. of Social Sec.</u>, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order); <u>see also</u> 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history . . . .").[30]  "[T]he current amended regulations . . .

_____

[30]On March 26, 2012, the regulations were modified to delete language which imposed a duty to recontact a treating physician when "the report from [a claimant's] medical source contain[ed] a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010); <u>see</u> <u>How We Collect & Consider Evidence of Disability</u>, 77 Fed.
(continued...)

give an ALJ more discretion to 'determine the best way to resolve

the inconsistency or insufficiency' based on the facts of the

case . . . ." <u>Rolon v. Comm'r of Soc. Sec.</u>, 994 F. Supp. 2d 496,

505 (S.D.N.Y. 2014) (Nathan, D.J.), <u>quoting</u> 20 C.F.R. §§

404.1520b(c)(1), 416.920b(c)(1) (2013).  However, the regulations

continue to "contemplate the ALJ recontacting treating physicians

when 'the additional information needed is directly related to

that source's medical opinion.'" <u>Jimenez v. Astrue</u>, 12 Civ. 3477

(GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013)

(Gorenstein, M.J.), <u>quoting</u> <u>How We Collect and Consider Evidence</u>

<u>of Disability</u>, <u>supra</u>, 77 Fed. Reg. at 10,652.

> Thus, even where a claimant is represented by counsel
> or a paralegal, an ALJ is under a duty to seek addi-
> tional evidence or clarification . . . .  "[I]f a
> physician's finding in a report is believed to be
> insufficiently explained, lacking in support, or incon-
> sistent with the physician's other reports, the ALJ
> must seek clarification and additional information from
> the physician." <u>Calzada v. Asture</u>, 753 F. Supp. 2d
> 250, 269 (S.D.N.Y. 2010); <u>see</u> <u>also</u> <u>Rosa</u>, 168 F.3d at 79
> (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir.
> 1996)).  The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did
> not know that the ALJ would consider it critical to the

---

[30](...continued)
Reg. 10,651, 10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts.
404, 416).  The amended regulations apply here.  <u>See</u> <u>Lowry v.</u>
<u>Astrue</u>, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order)
(applying the version of the regulations that were current at the
time the ALJ adjudicated the plaintiff's claim).

disposition of the case.'"  <u>Rosa</u>, 168 F.3d at 80 (quoting <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998)).

<u>Geronimo v. Colvin</u>, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5 (S.D.N.Y. Feb. 20, 2015) (Carter, D.J.).

"The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness[], due to the difficulty in determining 'whether these individuals will be able to adapt to the demands or "stress" of the workplace.'"  <u>Hidalgo v. Colvin</u>, 12 Civ. 9009 (LTS)(SN), 2014 WL 2884018 at *4 (S.D.N.Y. June 25, 2014) (Swain, D.J.), <u>quoting</u> <u>Lacava v. Astrue</u>, 11 Civ. 7727 (WHP)(SN), 2012 WL 6621731 at *12 (S.D.N.Y. Nov. 27, 2012) (Netburn, M.J.) (Report & Recommendation), <u>adopted</u> <u>at</u> 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012) (Pauley, D.J.).

### 4.  <u>Treating Physician Rule</u>

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2);[31] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the

---

[31]The Social Security Administration recently adopted regulations that change the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017.  See 20 C.F.R. §§ 404.1520c, 416.920c.  Because plaintiff's claim was filed before that date, those regulations do not apply here.

frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.).  Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor.  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary

44

order).  "The opinions of examining physicians are not control-
ling if they are contradicted by substantial evidence, be that
conflicting medical evidence or other evidence in the record."
Krull v. Colvin, 15-4016, 2016 WL 5417289 at *1 (2d Cir. Sept.
27, 2016) (summary order) (citation omitted); see also Monroe v.
Commr. of Social Sec., 16-1042-CV, 2017 WL 213363 at *1 (2d Cir.
Jan. 18, 2017).  The ALJ is responsible for determining whether a
claimant is "disabled" under the Act and need not credit a
treating physician's determination to this effect where it is
contradicted by the medical record.  See Wells v. Comm'r of Soc.
Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The
ALJ may rely on a consultative opinion where it is supported by
substantial evidence in the record.  See Richardson v. Perales,
supra, 402 U.S. at 410; Camille v. Colvin, 652 F. App'x 25, 27-28
(2d Cir. 2016) (summary order); Diaz v. Shalala, 59 F.3d 307, 313
n.5 (2d Cir. 1995); Mongeur v. Heckler, supra, 722 F.2d at 1039.


    5.  Credibility


        In determining a claimant's RFC, the ALJ is required to
consider the claimant's reports of pain and other limitations, 20
C.F.R. § 416.929, but is not required to accept the claimant's
subjective complaints without question.  McLaughlin v. Sec'y of
Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980).

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984). The ALJ has discretion to assess the credibility of the claimant's testimony in light of the medical findings and other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective assertions of disability.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [the claimant's] impairment(s), [the claimant's] restrictions, [the claimant's] daily activities, [the claimant's] efforts to work, or any other relevant statements [the claimant] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

46

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis
in original); see also 20 C.F.R. § 416.929(a); Snyder v. Colvin,
15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary
order), citing SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016).[32]  The
ALJ must explain the decision to reject a claimant's testimony
"'with sufficient specificity to enable the [reviewing] Court to
decide whether there are legitimate reasons for the ALJ's disbe-
lief' and whether [the ALJ's] decision is supported by substan-
tial evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250, 280
(S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in original),
quoting Fox v. Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at
*12 (N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp.
2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determina-
tion of credibility is entitled to deference.  See Snell v.
Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ
is in a better position to decide issues of credibility");
Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)
(Leisure, D.J.) ("Deference should be accorded the ALJ's determi-
nation because he heard Plaintiff's testimony and observed his
demeanor.").

---

[32]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
See SSR 16-3P, supra, 2016 WL 1237954.

B.    The ALJ's
      <u>Decision</u>

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 13-20).

As an initial matter, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2015 (Tr. 13).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 4, 2010 (Tr. 13).

At step two, the ALJ found that plaintiff suffered from the following severe impairments:  axial back pain with degenerative disease and lumbar sprain (Tr. 13).  The ALJ found that plaintiff's alleged impairments due to panic attacks and weakness in his right hand were not severe impairments and stated that

> there are no diagnoses of either condition in the medical record, including the claimant's retirement paperwork as seen in Exhibit 3F.  When reviewing the medical evidence as a whole, there is no clinical or diagnostic evidence substantiating that the claimant suffers from panic attacks or a weakened grip of the right hand.  Absent corroborating diagnostic evidence, an impairment of the right hand and panic attacks is not medically determinable.

(Tr. 13).

At step three, the ALJ found that plaintiff's disabilities did not meet the criteria of the listed impairments and was

48

therefore not entitled to a presumption of disability (Tr. 13-
14).  In reaching her conclusion, the ALJ stated that she gave
"[s]pecific consideration" to "the applicable sections of 1.00
Musculoskeletal System of the listed impairments" (Tr. 14).

          The ALJ then determined that plaintiff retained the
RFC to perform sedentary work except that he can

> lift and carry five to ten pounds, sit, stand, and walk
> for six hours in an eight hour workday, and occasion-
> ally stoop and reach.  The claimant must be given the
> opportunity to change positions at thirty to sixty
> minute intervals and cannot perform highly skilled jobs
> due to the side effects of medication.

(Tr. 27).  To reach her RFC determination, the ALJ examined the
opinions of the treating and consulting physicians and determined
the weight to be given to each opinion based on the objective
medical record, including the treatment notes of plaintiff's
treating physicians (Tr. 14-19).

          The ALJ assessed the opinion evidence in the record and
gave more weight to the opinions of those doctors that the ALJ
found to be consistent with the objective medical evidence.
Specifically, the ALJ gave "considerable weight" to the opinion
of consulting examiner Dr. Davis because Dr. Davis examined
plaintiff on two occasions, ten months apart; based on Dr. Davis'
findings, the ALJ concluded plaintiff could do sedentary work
(Tr. 18).  The ALJ also found that Dr. Davis' opinions were
"supported by the overall medical evidence" (Tr. 18).

The ALJ gave "some weight" to consulting examiner Dr. Corvalan's opinion that plaintiff had restrictions in his lower back that are not disabling (Tr. 18, citing Ex. 8F).  The ALJ gave "little weight" to Dr. Corvalan's opinion that plaintiff had limitations in his neck because "there is no evidence in the medical record of a neck impairment" (Tr. 18).

The ALJ gave "little weight" to the opinion of plaintiff's orthopedist, Dr. Jacobs, that plaintiff has a 75% disability because that is an issue reserved for the Commissioner (Tr. 18-19).

Finally, the ALJ gave "some weight" to plaintiff's treating physician Dr. Basri's opinion stating:

> Some weight is also given to Dr. Basri with greater weight being assigned to the medical questionnaire's opinion [sic] that the claimant can lift and carry up to ten pounds, which is consistent with the findings of the other doctors in the medical record.  However, the undersigned gives lesser weight to those portions which suggest the claimant [is] incapable of being able to perform even sedentary work, which does not coincide with the benign objective findings.

(Tr. 18).

In reaching her RFC determination, the ALJ also considered plaintiff's testimony and found that while plaintiff's medically determinable impairments could reasonably have caused his alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persis-

50

tence and limiting effects were not entirely credible (Tr. 17). The ALJ pointed out that plaintiff's description of his daily activities demonstrated that he is not as limited as he claimed because plaintiff told Dr. Corvalan that he shops, does laundry, socializes, reads and pursues photography as a hobby (Tr. 17). The ALJ also found that plaintiff's credibility was undermined by the fact that he has only pursued the "conservative treatment" of physical therapy and medication, "[d]iagnostic studies [were] negative for a herniation and radiculopathy," plaintiff retained full muscle strength in his legs, there was no evidence of muscle atrophy in his legs[33] and plaintiff had never been hospitalized for reasons relating to his lower back (Tr. 17-18).

At step four, the ALJ concluded that, because plaintiff is limited to sedentary work, plaintiff is unable to perform his past work as a detective and background investigator, which require light exertional physical exertion, or his past work as a patrol officer, which requires medium physical exertion (Tr. 19).

_____

[33]The ALJ did not specify that he was referring to plaintiff's leg muscle strength or atrophy, (Tr. 18 ("His strength remains full and there is no evidence of atrophy")), but the ALJ's earlier summary of the medical evidence suggests that the ALJ was referring to plaintiff's leg strength.  Earlier in the opinion, the ALJ noted Dr. Corvalan's October 2012 examination of plaintiff's legs in which Dr. Corvalan concluded that plaintiff had full strength in the "proximal and distal muscles" and "[n]o muscle atrophy" (Tr. 17, 438-39).

51

At step five, relying on the testimony of the voca-
tional expert, the ALJ found that jobs existed in significant
numbers in the national economy that plaintiff could perform,
given his RFC, age and education (Tr. 20).  The ALJ noted that
the vocational expert testified that given plaintiff's age,
education, work experience and RFC, plaintiff could perform
unskilled sedentary work as a charge account clerk, DOT 205.367-
014, which has 196,000 positions nationally and as an addressing
clerk, DOT 209.587-010, which has 96,000 positions nationally
(Tr. 20).  Concluding that the expert's testimony was consistent
with information in the DOT, the ALJ determined plaintiff could
perform those occupations and, accordingly, was not disabled (Tr.
20).

    C.  Analysis of the
        ALJ's Decision

Plaintiff argues that remand is required because the
ALJ erred by (1) failing to develop the record as to all of
plaintiff's impairments, (2) failing to give controlling weight
to the opinions and diagnoses of plaintiff's treating physicians,
(3) improperly assessing plaintiff's credibility and (4) improp-
erly relying on the vocational expert's testimony (Pl. Mem. of
Law in Supp. of Motion for Judgment on the Pleadings, dated May
9, 2016 (D.I. 18) ("Pl. Mem.")).  The Commissioner argues that

the ALJ applied the correct legal standards and that her decision is supported by substantial evidence (Def. Mem. of Law in Opp. to Pl. Motion for Judgment on the Pleadings and in Supp. of Commissioner's Cross-Motion for Judgment on the Pleadings, dated July 8, 2016 (D.I. 20) ("Def. Mem.")).

    1.  <u>Duty to Develop the Record</u>

Remand is warranted because despite evidence in the record indicating that plaintiff had anxiety and panic attacks, the ALJ rejected these conditions as not being supported by medical evidence without first fully developing the record concerning them.  At step two of her analysis, the ALJ stated that "there is no clinical or diagnostic evidence substantiating that the claimant suffers from panic attacks" and that absent such "corroborating diagnostic evidence," an impairment of "panic attacks is not medically determinable" (Tr. 13).  The ALJ's analysis was erroneous because there was evidence in the record that plaintiff's primary treating doctor, Dr. Basri, treated plaintiff for anxiety and panic attacks.  Further, some of Dr. Basri's treatment notes appear to be missing and the notes that were collected appear to be superficial and are, in large part, illegible.  Given that Dr. Basri was plaintiff's treating physician during the relevant period, the foregoing deficiencies in

the records obtained from Dr. Basri gave rise to an "obvious gap"
in the medical record that may have affected the ALJ's disability
determination.

Plaintiff testified at the December 17, 2013 hearing
that when he has an anxiety attack "[o]ftentimes, it's so bad, I
feel like I need to go to the emergency room and I've had several
trips" (Tr. 69). He further testified that his anxiety was
related to his back pain and the medication he took for the pain:

> [ALJ:] You have side effects from your medicine?
>
> [Plaintiff:] Sometimes, yes. When I initially started
> taking morphine, I, it would give me sweats, dry mouth.
> I feel very anxiety about it [sic] because the connota-
> tion of morphine itself[,] being a [police officer],
> you know, it's kind of a negative things [sic].
>
> So it would make me anxious about having to take these
> things. I'm worried about the addictive properties of
> these. I didn't realize at the time, it's actually
> caused a bowel obstruction which caused me to seek
> emergency room treatment approximately two weeks ago
> where they wanted to admit me for two days and consult
> with a surgeon due to the bowel blockage.

(Tr. 63).[34]

There is documentary evidence in the record confirming
that plaintiff went to the emergency room in December 2013 and on

------

[34]Plaintiff also testified that he did not see a therapist
or a psychiatrist about his anxiety and he stated that he did not
believe that he was depressed (Tr. 69-70). Plaintiff elaborated
that "I believe and I really shouldn't be self-diagnosing myself,
it's lack of sleep, worried about taking the medicine, how it's
going to affect me long term, what it's doing to my body, how
it's going to affect me for the rest of my life" (Tr. 70).

at least one other date due to his anxiety.  The record contains
a December 2, 2013 treatment note from Dr. Basri stating that
plaintiff went to the emergency room at Orange Regional Medical
Center (Tr. 453), but does not contain a corresponding record
from the hospital from that date.  Dr. Basri's note is largely
illegible, but the words "surgeon" and "obstruction" can be made
out (Tr. 453).  The medical record also includes a discharge note
from Orange Regional Medical Center dated August 3, 2010 indicat-
ing an emergency room visit (Tr. 342-43).  The hospital record
does not include treatment notes or a narrative summary explain-
ing the reason for plaintiff's visit.  However, the discharge
note included a prescription for Xanax (Tr. 342-343).  Xanax is
prescribed "in the treatment of anxiety disorders and panic
disorders and for short-term relief of anxiety symptoms."
Dorland's at 54.  There is no indication that the ALJ either
sought the emergency room records or asked counsel to provide
them.

Moreover, the treatment notes from Dr. Basri for the
period from January 2011 through November 2013 show that plain-
tiff repeatedly complained of anxiety and panic attacks and that
Dr. Basri prescribed anti-anxiety medication for plaintiff (Tr.
453-58).  Although the treatment notes are brief and, at times,
illegible, Xanax is noted at least twelve times in Dr. Basri's

treatment notes (Tr. 453-58).  There are also at least three
legible references in Dr. Basri's notes to Cymbalta (Tr. 453-58),
which is "used for the treatment of major depressive disorder . .
. ." Dorland's at 457, 572.  Although a prescription for a
psychotropic medication is not conclusive evidence of a medical
impairment, contrary to the ALJ's conclusion, it does constitute
clinical evidence corroborating plaintiff's testimony that he was
suffering from potentially debilitating panic attacks.  Dr. Basri
also noted that he had seen plaintiff regularly since June 2010
but the record does not contain any of his treatment notes
preceding February 2011 (Tr. 260).  The ALJ did not ascertain
whether treatment notes from Dr. Basri were missing, did not seek
clarification of the illegible and sketchy notes that were
provided and did not seek further information from Dr. Basri such
as the frequency of plaintiff's anxiety attacks, how long they
lasted and their effect on plaintiff's ability to maintain
concentration at work.  The ALJ's failure to consider the evi-
dence in the record and to develop and clarify the record regard-
ing plaintiff's anxiety warrants remand.  See Pratts v. Chater,
supra, 94 F.3d at 38 (remanding for further development of the
record where portions of plaintiff's medical history were miss-
ing, some of the medical records were "frequently incomplete or
illegible and provide[d] no coherent overview" of the plaintiff's

treatment and because the ALJ's conclusion that there was "no evidence" of certain conditions was contradicted by the record that was available); Moreira v. Colvin, 13 Civ. 4850 (JGK), 2014 WL 4634296 at *6-*7 (S.D.N.Y. Sept. 15, 2014) (Koeltl, D.J.) (ALJ erred by failing to "ascertain the treating physicians' opinions and analyses with respect to the plaintiff's precise medical conditions" where the "records from the treating sources also appear[ed] to be inconsistent with the consultative exam on which the ALJ relied").[35]

The Commissioner argues that the record clearly shows that Dr. Basri did not believe that plaintiff had a medical impairment as a result of his anxiety attacks.  The Commissioner points to Dr. Basri's September 2012 medical source statement in which Dr. Basri opined that plaintiff did not have a significant "psychiatric disorder" and indicated that, aside from his back

---

[35]The ALJ could also have sought the opinion of a consulting mental health professional.  See Tankisi v. Commr. of Social Sec., 521 F. App'x 29, 32 (2d Cir. 2013) (summary order) ("A consultative examination is used to 'try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision' on the claim.") (citation omitted); Hooper v. Colvin, 199 F. Supp. 3d 796, 811, 816 (S.D.N.Y. 2016) (Cott, M.J.) (remanding for further development of the record through a "comprehensive assessment" of plaintiff's limitations from a consulting or treating physician because "[a]lthough the record [was] extensive, the absence of any up-to-date medical opinion assessing [the claimant's] mental functional limitations [was] an 'obvious gap.'")

condition, plaintiff had no other "conditions significant to recovery" (Def. Mem. at 17, citing Tr. 426, 432).

The Commissioner's argument is unavailing for two reasons.  First, contrary to the ALJ's findings, Dr. Basri did not find that plaintiff did not have a psychiatric impairment relating to his anxiety; rather, he found that plaintiff did not have a "significant psychiatric disorder" (Tr. 426).  The Commissioner's argument, therefore, conflates the doctor's opinion concerning the extent of a condition with the existence of the condition.  Second, Dr. Basri's treatment notes contradict his September 2012 medical source statement.  In his September 2012 statement, in addition to the opinion noted above, Dr. Basri indicated that he prescribed plaintiff narcotic pain medication and made no reference to anti-anxiety medication (Tr. 426, 429). However, on the same day that Dr. Basri filled out the form, Dr. Basri's treatment notes indicate that he gave plaintiff a prescription for Xanax (Tr. 456).  Further, one month earlier, on August 14, 2012, Dr. Basri noted that plaintiff had had two anxiety attacks related to back pain and indicated that he gave plaintiff a prescription for Xanax (Tr. 456).  It is not clear why the doctor omitted plaintiff's other medications and other conditions from his September 2012 statement, but it demonstrates a gap in the record that warranted clarification.  Given this

conflicting evidence, it was not appropriate for the ALJ to guess whether Dr. Basri had diagnosed plaintiff with an anxiety disorder or not, he should have contacted the physician to clarify the record.

The ALJ's refusal to consider plaintiff's anxiety was not harmless error.  Even if the evidence ultimately shows that plaintiff's anxiety was not a severe impairment, the ALJ was, nevertheless, required to take it into account in her analysis of plaintiff's RFC.  "A RFC determination must account for limitations imposed by both severe and nonsevere impairments." Parker-Grose v. Astrue, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order), citing 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe [ ]' . . . when we assess your [RFC] . . . .") and 20 C.F.R. § 416.945(a)(2) (same); see Schmidt v. Colvin, 15-CV-2692 (MKB), 2016 WL 4435218 at *13 (E.D.N.Y. Aug. 19, 2016) ("Because the ALJ failed to account for the limitations imposed by Plaintiff's non-severe mental impairments, the Court remands for consideration of those limitations in determining Plaintiff's RFC."); Jackson v. Colvin, No. 1:14-CV-00055 (MAT), 2016 WL 1578748 at *4 (W.D.N.Y. Apr. 20, 2016) ("[T]he ALJ failed to properly consider [the] plaintiff's mental impairments, whether

severe or non-severe, throughout the entire five-step sequential evaluation.  As a result, the ALJ's RFC finding was not supported by substantial evidence."); Rookey v. Comm'r of Soc. Sec., No. 7:14-cv-914 (GLS), 2015 WL 5709216 at *3 (N.D.N.Y. Sept. 29, 2015) (reversing and remanding where the ALJ "fail[ed] to consider [the plaintiff's] non-severe mental impairments in determining his RFC"); Salisbury v. Colvin, 13 Civ. 2805 (VEC)(MHD), 2015 WL 5458816 at *44 (S.D.N.Y. Sept. 1, 2015) (Dolinger, M.J.) (Report & Recommendation) ("However, even if non-severe, the ALJ must account for limitations arising from that mental impairment when determining plaintiff's RFC."), adopted at 2015 WL 5566275 (S.D.N.Y. Sept. 21, 2015) (Caproni, D.J.); Johnson v. Colvin, No. 12-CV-1273 (GLS), 2013 WL 6145804 at *5 (N.D.N.Y. Nov. 21, 2013) (remanding because "failure to consider [the plaintiff's] mental impairments and abilities in assessing her RFC is legal error"); Dixon v. Astrue, Civil No. 10-5703 (RBK), 2011 WL 4478493 at *12 (D.N.J. Sept. 26, 2011) ("[T]he ALJ properly evaluated Plaintiff's depression to determine that it was not severe" but erred in omitting it from his RFC determination without explanation). On remand, if the evidence establishes that plaintiff suffers from anxiety or panic attacks, the ALJ should consider these conditions in her RFC analysis regardless of their severity.

Accordingly, remand is required for further development of the record with respect to plaintiff's allegations that he had anxiety and panic attacks.[36]

### 2. Treating Physician Rule

Even if the ALJ had not erred in failing to seek further development of the record regarding plaintiff's anxiety attacks, remand is also required because the ALJ failed adequately to justify giving less than controlling weight to Dr. Basri's opinions regarding plaintiff's physical limitations.  The ALJ rejected Dr. Basri's conclusions about the amount of time plaintiff could sit, stand and walk during a workday because he believed they did "not coincide with the benign objective findings" (Tr. 18).  In another portion of the opinion, the ALJ stated that "diagnostic studies [were] negative for a herniation and radiculopathy" and that plaintiff's "strength remains full

---

[36]Plaintiff also argues that the ALJ erred by finding that plaintiff's alleged weakness in his right hand was not a medically determinable impairment.  However, plaintiff has not identified any evidence in the record  demonstrating that his right hand weakness was a medically determinable impairment. Plaintiff cites to his own testimony and a physical therapist statement that plaintiff's grip in his right hand was 140 pounds and his left hand grip was 100 pounds (Pl. Mem. at 7-8, 17 citing Tr. 348).  There is no medical evidence in the record that indicates whether this is normal for plaintiff's age, weight and height.  Nevertheless, on remand, plaintiff may wish to submit further evidence on this issue to the ALJ.

and there is no evidence of atrophy" (Tr. 18).   However, these
are not the only objective findings in the record, and contrary
to the ALJ's conclusion, herniation, radiculopathy and atrophy
are not the only indicators of back pain.   The ALJ ignored other
medically acceptable, objective evidence such as (1) an MRI from
May 2010 that showed that plaintiff had a mild multi-level
degenerative disc disease, a concentric disc bulge with a poste-
rior annular tear, and disc bulges that contributed to mild
central canal stenosis (Tr. 313), (2) an x-ray from May 2010 that
showed "mild disc space narrowing" and "partial lumbarization" of
the first sacral segment (Tr. 336) and (3) an x-ray from October
2012 that showed that plaintiff had straightening of the spine
(Tr. 441).   Further, Dr. Jacobs, a neurosurgeon, and Dr.
Corvalan, an orthopedist, found that plaintiff had positive
straight leg-raising tests in August 2010 and October 2012,
respectively (Tr. 397, 438-39).   The treating and consulting
physicians found that upon examination, plaintiff had limited
and/or painful range of motion in the lumbar spine at various
points throughout the relevant period (Tr. 374 (May 2010, Orange
Regional Medical Center emergency room doctor), 397 (August 2010,
Dr. Jacobs), 265-66 (August 2010, Dr. Dunkelman), 434 (September
2012, Dr. Basri), 438-39 (October 2012, Dr. Corvalan).   Contrary
to the ALJ's conclusions, this evidence is not "benign" and

supports plaintiff's testimony that he had lower back pain that restricted his daily activities.

The ALJ's rejection of Dr. Basri's opinion was not harmless because the doctor's assessment of plaintiff's limited ability to stand, walk and sit would have changed plaintiff's RFC. The ALJ concluded that plaintiff could "sit, stand, and walk for six hours in an eight hour workday" (Tr. 14) even though Dr. Basri concluded that plaintiff could stand and walk for less than two hours and sit for less than six hours in a workday (Tr. 431). The ALJ gave "considerable weight" to Dr. Davis and concluded that his "findings are consistent with a sedentary [RFC]" (Tr. 18). However, Dr. Davis did not quantify plaintiff's ability to walk or stand, stating instead that plaintiff should be able to change positions "as necessary such as . . . sitting and standing" (Tr. 400).

The ALJ also relied on Dr. Corvalan's opinion that plaintiff had "moderate limitations" on his ability to sit and stand for long periods of time and on his ability to walk for long distances and concluded that plaintiff could engage in sedentary work (Tr. 18). Dr. Corvalan's use of the word "moderate" is vague and provides no support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day. See Curry v. Apfel, 209 F.3d 117, 123 (2d Cir.

2000) (doctor's opinion that used the terms "moderate" and "mild" was "so vague as to render it useless" in evaluating whether plaintiff could perform sedentary work), <u>superseded on other grounds</u>, 20 C.F.R. § 404.1560; <u>accord</u> <u>Falk v. Colvin</u>, 15 Civ. 3863 (ER)(KNF), 2016 WL 4411423 at *6 (S.D.N.Y. Aug. 18, 2016) (Ramos, D.J.) (consulting doctor's statement that the plaintiff "had a 'moderate limitation for sitting and standing for long periods of time'" was "too vague an opinion to be useful" with respect to plaintiff's ability to sit for six hours and stand and walk for two hours).[37]

By rejecting Dr. Basri's opinion, the ALJ thus "arbitrarily substitute[d] [her] own judgment for a competent medical opinion." <u>Rosa v. Callahan</u>, <u>supra</u>, 168 F.3d at 79.   Thus, the ALJ failed to provide good reasons for providing less weight to Dr. Basri's opinions in the September 2012 medical source statement.

---

[37]The ALJ also relied on Dr. Corvalan's opinion that plaintiff had "moderate" limitations in bending to find that plaintiff could stoop "occasionally" (Tr. 14, 18, 439).  The only other doctor that gave an opinion concerning plaintiff's ability to bend or stoop was Dr. Davis, who stated that plaintiff should avoid "prolonged" bending or stooping (Tr. 287).  Moreover, five of the doctors that examined plaintiff found that plaintiff had a limited range of motion in flexion of his lumbar spine (Tr. 265-66, 374, 397, 434, 438-39).  On remand, the ALJ should, therefore, further develop the record concerning this issue or provide revised support for her conclusions regarding plaintiff's ability to stoop and bend.

To the extent plaintiff claims that Dr. Basri's opinion should be adopted as controlling, plaintiff's argument is premature.  As discussed herein, the record in this case needs to be developed further with respect to plaintiff's treatment by Dr. Basri, and, until the record is further developed, the weight to be given to Dr. Basri's opinions cannot be determined.  <u>See</u> <u>Downes v. Colvin</u>, 14 Civ. 7147 (JLC), 2015 WL 4481088 at *12 (S.D.N.Y. July 22, 2015) (Cott, M.J.) ("Even if the ALJ's decision might ultimately be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record.").  Indeed, further development of the record may also clarify Dr. Basri's opinions on plaintiff's physical limitations.

The ALJ failed to provide sufficient "good reasons" for the less than controlling weight she gave to Dr. Basri's opinions and erred in not seeking clarification from Dr. Basri to reconcile the inconsistencies and fill the gaps in the record.  On remand, the ALJ should further develop the record from plaintiff's treating physician and reassess plaintiff's treating physicians' opinions according to the factors set forth in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

3.   Credibility Assessment

As discussed above, the ALJ failed to develop the record adequately and her reliance on an incomplete record affected her view of the relationship between plaintiff's testimony and the medical record.  Further, as discussed above at pages 62-63, the ALJ ignored the objective evidence that was consistent with plaintiff's complaints of pain.  Moreover, if anxiety and insomnia were indeed side effects of plaintiff's pain medication (see Tr. 63), the ALJ should have considered those side effects in her analysis of plaintiff's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (summary order) (side effects from medication should be considered by the ALJ when making the credibility determination); 20 C.F.R. §§ 404.1529(c)(3) (iv), 416.929(c)(3)(iv) ("type, dosage, effectiveness, and side effects" of any medication taken by the claimant to alleviate his or her pain or other symptoms are factors relevant to a disability determination); SSR 16-3p, supra, 2016 WL 1119029 at *6 (noting that the SSA will consider statements from medical sources including "[a] longitudinal record of any treatment and its success or failure, including any side effects of medication").  Thus, it is impossible to determine whether the ALJ's credibility determination is supported by substantial evidence based on the current record.  See Rosa v.

66

Callahan, supra, 168 F.3d at 82 n.7 ("Because we have concluded
that the ALJ was incorrect in [his] assessment of the medical
evidence, we cannot accept [his] conclusion regarding [plain-
tiff's] credibility."); Montilla v. Comm'r of Soc. Sec., 13 Civ.
7012 (LTS)(MHD), 2015 WL 4460958 at *22 (S.D.N.Y. July 21, 2015)
(Swain, D.J.) ("While the ALJ has supported his credibility
findings with sufficient detail and attention to the factors
specified in the regulations and caselaw, it is nonetheless
unacceptable because it is based on a record that has not been
properly and fully developed."); Wilson v. Colvin, 107 F. Supp.
3d 387, 407 n.34 (S.D.N.Y. 2015) (Peck, M.J.) ("Because of [the
ALJ's] legal error in failing to develop the record . . .  the
Commissioner necessarily will have to reassess both [plaintiff's]
RFC and credibility"); Jackson v. Colvin, 13 Civ. 5655 (AJN)(SN),
2014 WL 4695080 at *21 (S.D.N.Y. Sept. 3, 2014) (Nathan, D.J.)
(on remand "the Commissioner will be required to reassess both
Jackson's credibility and her RFC in light of the new evidence").
On remand, therefore, the ALJ should re-evaluate plaintiff's
testimony after taking steps to develop the record as directed.

4.   Vocational Expert Testimony
and the ALJ's Decision at Step Five

Further development of the record may alter the ALJ's
assessment of plaintiff's RFC.  Therefore, I cannot determine at

this time whether the ALJ elicited relevant testimony from the vocational expert. See Meadors v. Astrue, supra, 370 F. App'x at 185-86; Patrick v. Colvin, No. 13-CV-2174 (SJF), 2015 WL 1469270 at *17 (E.D.N.Y. Mar. 30, 2015).

IV.   Conclusion

          For all the foregoing reasons, plaintiff's motion for judgment on the pleadings (D.I. 16) is granted and the matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The Commissioner's cross-motion for judgment on the pleadings (D.I. 19) is denied.

Dated:   New York, New York
         March 27, 2017

                                   SO ORDERED

                                   HENRY PITMAN
                                   United States Magistrate Judge

Copies transmitted to:

Carolyn A. Kubitschek, Esq.
Lansner & Kubitschek
Suite 203
325 Broadway
New York, New York   10007

Irwin M. Portnoy, Esq.

Irwin M. Portnoy and Associates, P.C.
542 Union Avenue
New Windsor, New York   12553

Amanda Parsels, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York   10007